# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

      -vs-                                CRIMINAL No. 13-3145 JCH

DANIEL PHILLIP TENORIO,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress Involuntary Statements (ECF No. 27).  The Court held a hearing on the motion on May 8, 2014.  The Court, having considered the motion, briefs, evidence, argument, and otherwise being fully advised, concludes that the motion to suppress should be denied.

## I.      INTRODUCTION

Bureau of Indian Affairs ("BIA") Special Agent Travis LeBeaux interviewed Defendant on two occasions regarding sexual abuse allegations made against him by his niece.  Defendant asks the Court to suppress the oral and written statements he made to Agent LeBeaux and Federal Bureau of Investigation ("FBI") Special Agent Jennifer Sullivan on November 5, 2012, following a polygraph test.

## II.     FACTUAL FINDINGS

Defendant was approximately 53 years old at the time of the interviews, has an eleventh grade education, was a medicine man, was on the tribal council, and was a tribal official.  *See*

Pl.'s Hr'g Ex. 1 (Tr. of October 2, 2012 interview) at 2:6-3:18, 8:8-15, 10:24-11:3.  Defendant was a tribal police officer in 1982 and counseled juveniles for four to five months in 1987.  *See* Hr'g Tr. 135:1-7, May 8, 2014.  Prior to this case, Defendant had never been arrested for any crime. *See id.* at 134:21-25.

On October 2, 2012, BIA Special Agent Travis LeBeaux met with Defendant at San Felipe Pueblo outside Defendant's sister's home where he was living at the time.  *See id.* at 160:24-162:16.  Agent LeBeaux recorded this interview, which was cordial.  *See* Pl.'s Hr'g Ex. 1 and Ex. 4.  The interview took place inside Agent LeBeaux's patrol vehicle in the front cab area. Hr'g Tr. 163:14-164:21, May 8, 2014.  Defendant spoke and understood English.  *See id*. at 165:25-166:24.  Agent LeBeaux informed Defendant that his niece had reported that Defendant had inappropriately touched her and made inappropriate sexual comments to children.  *See* Pl.'s Hr'g Ex. 1 at 5:8-25.  Before questioning him, Agent LeBeaux read him his *Miranda* rights and had him initial after each question and had him sign the form.  *See id.* at 11:4-14:10; Pl.'s Hr'g Ex. 3.  Defendant noted that he had been a tribal official and understood his *Miranda* rights.  *See* Pl.'s Hr'g Ex. 1 at 8:7-15.  Defendant repeatedly denied the allegations made against him.  *See, e.g., id.* at 40:1-4, 46:3-16, 69:17-18, 72:8-9, 85:19-25.  Agent LeBeaux told him that this was a federal investigation.  *See* Hr'g Tr. 178:7-19, May 8, 2014.

Agent LeBeaux then explained that one of the ways he could close out a case such as this is to have the accused, which in this case is Defendant, take a polygraph test.  *See* Pl.'s Hr'g Ex. 1 at 47:18-25.   Agent LeBeaux asked if Defendant knew what a polygraph test was, and Defendant replied that he did.  *See id.* at 48:7-14.  Agent LeBeaux then asked whether Defendant would be willing to take a polygraph test, and he said yes, because he did not have anything to hide.  *See id.* at 49:13-20.  Later in the interview, Agent LeBeaux again asked if Defendant was

willing to take a polygraph, and Defendant again said that he was.  *See id.* at 78:11-17.  Agent LeBeaux explained to Defendant, "The FBI . . . has a polygrapher, an agent that does it in Albuquerque."  *Id.* at 87:1-4.  Agent LeBeaux said that he could set it up within the next few weeks, come up and get him, take him, get it done, and then come back out.  *Id.* at 87:6-10.  At one point, Defendant asked if he could drive himself down there, and Agent LeBeaux said yes. *Id.* at 89:23-90:3.  Agent LeBeaux said he would contact Defendant a day ahead of time when he knew the date the test could be done.  *See id.* at 90:7-16.  Defendant later reiterated that he knew he would pass the polygraph.  *See id.* at 95:10-16.  Defendant did not have a phone that he could make calls or text messages out, but he could receive messages.  *See id.* at 99:2-101:10.  Agent LeBeaux said that he would check in with Defendant or swing by in person.  *See id.* at 99:22-100:5.  This interview lasted approximately 90 minutes. Hr'g Tr. 180:2-4, May 8, 2014.

On November 5, 2012, Agent LeBeaux went to San Felipe Pueblo again and met Defendant at his work site, because it had previously been difficult to get ahold of Defendant. *Id.* at 180:11-16.  Agent LeBeaux was wearing a polo shirt, cargo pants, boots, and a sidearm with his badge on his belt.  *Id.* at 181:6-8.  Agent LeBeaux explained to Defendant that an FBI agent was available that day to give a polygraph test and that Agent LeBeaux could give him a ride to and from Albuquerque.  *Id.* 180:19-24.  Defendant voluntarily agreed to go to Albuquerque in Agent LeBeaux's vehicle to take the polygraph test.  *Id*. at 180:19-181:3, 210:20-22.

For safety reasons, Defendant sat in the back of Agent LeBeaux's vehicle with a clear Plexiglass window separating the front and back seats.  *Id.* at 182:13-25.  Defendant was not handcuffed during the approximately 30-minute trip to Albuquerque.  *See id.* 184:13-25.  The vehicle's childproof lock was enabled, which would have prevented Defendant from getting out

of the car on his own.  *See id.* at 192:14-21.  Defendant, however, never indicated that he wanted to get out of the vehicle.  *See id.* at 210:23-25.

Upon arrival at the FBI office, Agent LeBeaux took Defendant through a secured, gated entrance into the FBI Headquarters and through the security check-in in the lobby.  *See id.* at 185:5-25.  Agent LeBeaux introduced him to Jennifer Sullivan and they all went into the center area of the FBI building to the room where the polygraph test would take place.  *See id.* at 185:25-186:15. The room had a window to the outside and was large enough for a desk, file cabinet, and three chairs.  *See* Pl.'s Hr'g Ex. 9-13.  Agent LeBeaux then left the building.  *See* Hr'g Tr. 186:17-187:5, May 8, 2014.

Agent Sullivan is a trained FBI polygrapher.  *See id.* 15:25-17:2.  Agent Sullivan gave Defendant two forms entitled "Consent to Interview with Polygraph" and "Advice of Rights," both of which he read and signed.  *See id.* at 30:22-40:1, 84:14-18; Pl.'s Hr'g Ex. 6 and 7.  Agent Sullivan attached the polygraph equipment onto Defendant, explaining as she went what the equipment did.  *See* Hr'g Tr. 25:6-27:13, May 8, 2014.  The equipment includes two fingerplates, two pneumograph tubes attached to the chest and abdomen, a small chain around the back to keep the tubes adhered to the chest, and a blood pressure cuff on the upper arm.  *See id.* 25:6-27:13,  89:3-25,  91:8-93:17.  Agent Sullivan began the interview, first asking biographical information.  *See id.* at 40:14-25.  She then conducted a "pretest" in which she discussed with him why he was there, including the allegations made against him.  *See id.* at 46:25-47:4, 97:4-12.  Defendant was cooperative, anxious, and ready to take the test.  *See id.* at 105:6-15.

Agent Sullivan then administered the polygraph test.  *See id.* at 42:15-17.  She asked him two "relevant" questions, which are the two questions she scores on the polygraph charts:  (1)

4

"Have you ever grabbed either of [Jane Doe's] breasts?" and (2) "Have you ever grabbed [Jane Doe's] breast at your mom's house?"  *Id.* at 47:16-22, 106:12-107:8; Pl.'s Hr'g Ex. 8 at 2. Defendant answered "no" to both questions.  *See* Hr'g Tr. 106:12-24, May 8, 2014; Pl.'s Hr'g Ex. 8 at 2.

Agent Sullivan believed that the polygraph test showed "deception indicated," a result with which her quality assurance manager concurred.  *See* Hr'g Tr. 50:6-51:7, 110:4-17, May 8, 2014.  Agent Sullivan then told Defendant that "he failed the test miserably."  *Id.* at 51:25-52:3. Defendant initially denied the fact that he failed the test, so Agent Sullivan showed him the polygraph charts on her computer, pointing out the portion of the chart where he answered the relevant questions.  *See id.* at 49:8-23, 52:5-13.

Agent Sullivan then became confrontational with Defendant, urging him more than once to "man up," telling him that he was not being truthful, and asking him numerous leading and confrontational questions.  *See id.* at 115:14-22, 116:21-118:20, 129:18-130:7, 140:6-141:13. However, she did not threaten him or make any promises of leniency.  *See id.* at 61:10-20.  Nor is there evidence that Agent Sullivan misrepresented that the victim or another witness took and passed a polygraph test.  *See id.* at 62:1-12.  Although FBI policy permitted Agent Sullivan to record the post-test interrogation, Agent Sullivan did not.  *See id.* at 121:8-124:21, 126:1-11.

Defendant became emotional and remorseful, confessing that he was ashamed of his behavior and that he had talked to children about sex in a nasty manner.  *See id.* at 53:3-17. Agent Sullivan asked Defendant if he would like to apologize to his niece for the way he treated her, and he said yes.  *See id.* at 53:23-54:2.  Agent Sullivan suggested that he write a letter of apology.  *See id.* at 129:1-4.  Defendant then wrote and signed the following letter:

First off [sic] all, I am [sorry] for what I put [Jane Doe] through.

> She was right to report it to the school.  I should not have grabbed her breast it was wrong.
>
> I lied to the BIA agent.  I lied to the FBI.  I am ashamed off [sic] my behavior.
>
> I should not have grabbed her ass.  I should not have talked nasty with those kids in the house.
>
> I should have been the role model.

*Id.* at 54:3-56:12; Pl.'s Hr'g Ex. 8 at 4 (FD-140 form).  Agent Sullivan helped him spell out some of the words.  *See* Hr'g Tr. at 54:13-16, May 8, 2014.  This post-test interrogation lasted about 40-60 minutes.  *See id.* at 133:7-22.

Agent Sullivan then called Agent LeBeaux to have him return.  *See id*. at 57:9-18.  It took Agent LeBeaux approximately 20 minutes after this call to arrive.  *See id.*  The two agents conferred, and then they went back to the polygraph room to continue the interrogation.  *See id.* at 58:8-13.  At this point, Agent LeBeaux began recording the interrogation with his tape recorder.  *See id.*

During this recorded interrogation, the agents used a cordial tone and Defendant did not seem distraught or overly emotional.  *See* Pl.'s Hr'g Ex. 5.  The agents never made any promises of leniency or threats to Defendant in this recorded interrogation, but they did repeatedly ask confrontational questions.  *See id.*; Hr'g Tr. 189:11-13, 210:5-10, May 8, 2014.  The agents asked Defendant questions, instructing him to tell them what they had just discussed, referring to the unrecorded interview that just occurred.  *See* Pl.'s Hr'g Ex. 2 at 2:12-4:1.  When Defendant merely admitted to talking nasty stuff around kids, Agent Sullivan implied that he should "man up" and admit to what he did that crossed the line.  *See id.* at 2:24-3:15.  Defendant admitted to touching his niece's breasts while playing around, but initially said that he did not mean to.  *Id.* at 4:5-5:2.  Agent Sullivan responded, "We're not going to play this game."  *Id.* at 5:6-7.  Agent

LeBeaux said, "if you really, really bullshit me anymore, you know, that's it," urging him to tell the truth and "just say it." *Id.* at 5:12-22.  Defendant then admitted to saying, "Hey, babe," to his niece when she passed near him, and slapping her on the buttocks.  *See id.* at 6:10-24.  He also confessed to grabbing her breast another time when playing around, which he admitted was wrong.  *See id.* at 7:3-9:4.  The agents then asked repeatedly why he had grabbed her breast and repeatedly asked if it was because she was developed and it looked good.  *See id.* at 9:5-13:22. Agent LeBeaux also urged him to tell the truth "so I know how to get you help." *Id.* at 12:20-21. The agents continued to urge Defendant to admit that he meant to touch his niece's breast and buttocks, at times using leading questions, and at other times urging him to be truthful. *See, e.g., id.* at 16:1-21, 22:16-20.  Defendant ultimately admitted that he made a mistake, crossed the line when talking to her nasty about sex, and that it was not an accident when he grabbed her breast and smacked her buttocks.  *See id.* 23:2-26:20, 43:6-44:7.  The recorded interview lasted about 30 minutes.  *See id.* at 1, 47:3.

The entire interrogation lasted approximately two-and-one-half hours, during which Defendant never asked to leave and never asked for a lawyer.  *See* Hr'g Tr. 157:10-14, May 8, 2014.  After the interrogation, Agent LeBeaux drove Defendant back to San Felipe Pueblo.  *See id.* at 189:16-20.  The agents never handcuffed Defendant at all that day.  *See id.* at 189:21-25.

## III.   ANALYSIS

The Fifth Amendment states: "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const., amend. V.  Relying on the Fifth Amendment, the Supreme Court has held that if police take a suspect into custody and interrogate him, they must inform him of his *Miranda* rights, or his responses cannot be introduced into evidence at trial to establish his guilt.  *See Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).  A statement may be

deemed involuntary even if a suspect has been given his *Miranda* rights and properly waived them.  *See United States v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006).  "But cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer*, 468 U.S. at 433 n.20.  The government bears the burden of showing by a preponderance of the evidence that the confession is voluntary.  *Lopez*, 437 F.3d at 1063.

The test of voluntariness is based on the totality of the circumstances, considering both the characteristics of the defendant and the details of the interrogation.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1976); *Lopez*, 437 F.3d at 1063.  The court must determine whether the defendant's confession is the product of an essentially free and unconstrained choice or if his will was overborne by physical or psychological coercion, threats, or by improper inducement.  *See Lopez*, 437 F.3d at 1063; *United States v. Erving L.*, 147 F.3d 1240, 1248-49 (10th Cir. 1998).  A confession is only involuntary if the police use coercive activity to undermine the suspect's ability to exercise free will.  *Erving L.*, 147 F.3d at 1249.  The Court looks to coercive police activity, express or implied.  *Schneckloth*, 412 U.S. at 227.

No single factor is determinative in the voluntariness inquiry.  *Lopez*, 437 F.3d at 1063. Relevant factors include (1) the suspect's age, education, and intelligence; (2) whether the suspect has been arrested and given *Miranda* warnings on earlier occasions, indicating previous experience with the criminal justice system; (3) the length of the detention and questioning; (4) the nature of the detention and questioning, such as whether threats or promises of leniency were made; (5) any advice of a suspect's constitutional rights; (6) the use of physical punishment; and (7) whether the suspect confessed to the crime or consistently denied any involvement in the crime throughout the interview.  *See Schneckloth*, 412 U.S. at 226; *Lopez*, 437 F.3d at 1063-65;

8

*United States v. Chalan*, 812 F.2d 1302, 1307-08 (10th Cir. 1987).   A suspect's personal characteristics are only relevant if the court first concludes that the officer's conduct was coercive. *Lopez*, 437 F.3d at 1064.

As for the nature of the questioning, promises of leniency are relevant in determining whether a confession was involuntary and may render a confession coerced. *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997).   The court must initially determine whether a promise of leniency was made to the defendant or if the defendant reasonably believed that such a promise had been made. *See United States v. Garot*, 801 F.2d 1241, 1244-45 (10th Cir. 1986).   If so, the court must determine whether the inducing promise was coercive – whether the accused was so gripped by a hope of leniency that he did not or could not freely and rationally choose among available courses of action. *See id.* at 1245.   The Court will now turn to the relevant factors in this case.

### A.       Characteristics of the Interrogation

Defendant was questioned on November 5, 2012, for approximately two-and-one-half hours.   This duration is not unduly long. *Cf. Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive.").   Moreover, there is no evidence that the agents used physical punishment against Defendant before, during, or after any of the interrogations.   These factors weigh in favor of the United States.

Additionally, Defendant was given *Miranda* warnings twice, both when Agent LeBeaux conducted his interview with Defendant on October 2, 2012, outside Defendant's residence, and on November 5, 2012, during the interrogation at the FBI office.   Both times, the agents gave Defendant an Advice of Rights form that outlined his *Miranda* rights, and both times, Defendant

9

read and signed the forms.  *See* Pl.'s Hr'g Ex. 3 and 7.  Additionally, Defendant read and signed a Consent to Interview with Polygraph form, which set forth his rights to refuse to take the polygraph.  *See* Pl.'s Hr'g Ex. 6.  The fifth factor thus also weighs in favor of a finding of voluntariness.

The fourth factor, the nature of the detention and questioning, is the critical factual issue in this case.  The Court finds, based on the following grounds, that the Government has met its burden of showing that the nature of the detention and questioning were not so coercive as to overbear Defendant's will.  As an initial matter, the fact that the questioning was conducted at the FBI Headquarters in a small room is not particularly remarkable where the circumstances show that Defendant voluntarily agreed to go there for the polygraph test.  *See United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) ("The fact that the questioning took place in close quarters is not significant in determining whether Anderson's statements were voluntary.").  Other relevant facts supporting voluntariness are that only one or two plain-clothes agents were ever in the room with Defendant during the interview, the room was well-lit with a window, and Defendant never told the agents during the interview that he wanted to stop talking to them and leave.  Although Agent Sullivan used confrontational and leading questions at times, these factors, alone, are not sufficiently coercive, given the overall cordial questioning.  *See Jenner*, 982 F.2d at 334 ("Numerous cases have held that questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.").

Defendant asserts that the polygraph procedure itself was sufficiently coercive to overbear Defendant's will.  The fact that Defendant initially denied having committed the

crimes, but only confessed after the pressure of the polygraph test and questioning by Agent
Sullivan, weighs in favor of Defendant; however, these facts are outweighed by the totality of the
evidence showing that Defendant voluntarily agreed to take the polygraph test and that his will
was not overborne during or after the test.  On October 2, 2012, Defendant agreed to go with
Agent LeBeaux to take a polygraph test.  Defendant again on November 5, 2012, agreed to go
with Agent LeBeaux to take the polygraph test.  Before the test, Agent Sullivan read him all his
rights, Defendant appeared to understand them, and he signed the consent forms.  Nothing in the
recorded portion of the November 5, 2012 interview suggests he took the test against his will.
The tenor of the questioning was cordial.  That Defendant confessed after having been truthfully
told that Agent Sullivan believed he had failed the polygraph examination is insufficient to
constitute coercion.  *See United States v. Wilson*, 16 F.3d 1223, *2 (6th Cir. 1994) (unpublished
opinion) (noting that there was nothing inherently coercive in truthfully informing suspect that
she had failed polygraph test and holding that confession was voluntary where suspect was not
under arrest at time of test, voluntarily submitted to test, and was advised of her *Miranda* rights
prior to test); *Jenner*, 982 F.2d at 334 ("It was not improper to inform Jenner that her polygraph
test results indicated deception, nor to resume questioning her as the officers had said they would
if the test results were adverse.  It was likewise permissible to elicit further statements by
claiming not to believe her denials.") (internal citations omitted); *United States v. Dyson*, No. Cr.
11-1386 MV, Mem. Op. and Order 14-17, ECF No. 137 (finding defendant's confession
voluntary, despite fact that it occurred after Agent Sullivan conducted polygraph test and after
she confronted defendant with results showing that defendant was lying); *United States v. Yazzie*,
No. Cr. 11-1876 WJ, Mem. Op. and Order Denying Def.'s Second Mot. to Suppress Statements
1-2, ECF No. 97 (same).

Moreover, there is no evidence in the record that Agent Sullivan misrepresented the evidence against Defendant.  In particular, there is no evidence that she told Defendant that either his niece or another witness had passed a polygraph test.  There is also no evidence that Agent Sullivan either threatened Defendant or promised him leniency.

Defendant relies extensively on Judge Armijo's opinion suppressing a defendant's confession following a polygraph test conducted by Agent Sullivan.  *See United States v. Maria Bundy*, No. Cr. 11-2043 MCA, Order, ECF No. 238.  That case, however, is of limited use here because the facts are different in significant respects.  *See id.*  In *Bundy*, the defendant was on several pain medications, including Percocet and oxycodone, at the time of the interrogation into whether she had driven the vehicle that had resulted in death.  *See id.* at 1, 13.  More importantly, the Court found that the Government had not shown that Defendant had an actual recollection of the events, such that her statements could be considered her own voluntary recollection of events as opposed to the products of suggestive and confrontational questioning that overbore her will. *See id.*  At the time of the crime, the defendant had a blood alcohol level of .299 and she remained adamant throughout the interview that she had blacked out.  *See id.* at 5.  The defendant's written statements after the interview were largely equivocal, making the lack of a recording during her supposed confession more significant because it undermined the Government's ability to prove the defendant had recalled the accident and confessed to driving at the particular time at issue.  *See id.* at 6-7.  In contrast, the critical factual issues here involve misrepresentations of evidence and promises of leniency, issues not present in *Bundy*.

In sum, the totality of the evidence regarding the characteristics of the interrogation show that the agents did not coerce Defendant into confessing or otherwise overbear his free will.

**B.      Personal Characteristics of the Defendant**

Because the Court does not find that the interrogation was coercive, it need not consider the personal characteristics of Defendant.  The Court nonetheless notes that the factors regarding Defendant himself weigh in favor of the United States and would mitigate any pressure and coercion that were present.  Although there is no evidence that Defendant had been previously arrested and Defendant only had an eleventh grade education, Defendant was 53 years old and was a former tribal police official, San Felipe medicine man, and tribal council member, indicating a greater level of intelligence and sophistication capable of understanding the criminal justice system and his rights.  Moreover, in the October 2, 2012 interview, Defendant was read his *Miranda* rights, and during that initial interview, when asked if he had ever had his rights read to him before, Defendant indicated that, as a tribal official, he had heard those rights before and understood them.  *See* Pl.'s Hr'g Ex. 1 at 8:7-15.  All this evidence weighs in favor of a finding that Defendant's confession was voluntary.

## IV.   CONCLUSION

After considering all the evidence, the Court finds that Defendant voluntarily consented to the polygraph examination and subsequent questioning.  Defendant was advised of his *Miranda* rights prior to the interrogation.  The United States met its burden of showing that Defendant's confession was the product of an essentially free choice and that his will was not overborne by improper physical or psychological coercion, threats, or inducement.  This case is not one of those "rare" cases in which the Court can find that Defendant's statements were compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda*.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Involuntary Statements (**ECF No. 27**) is **DENIED**.

_____

**UNITED STATES DISTRICT JUDGE**